**FIRST UNION NATIONAL BANK, Petitioner,**

v.

**COMMONWEALTH OF PENNSYLVANIA, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Nov. 3, 2004.

Decided Feb. 2, 2005.

Kyle O. Sollie and Lee A. Zoeller, Philadelphia, for petitioner.

Michael A. Roman, Senior Deputy AG, Harrisburg, for respondent.

BEFORE: COLINS, President Judge, McGINLEY, J., SMITH–RIBNER, J., LEADBETTER, J., COHN JUBELIRER, J., SIMPSON, J., and LEAVITT, J.

OPINION BY Judge COHN JUBELIRER.

This case involves the tax ramifications following the merger of three banks—two with significant Pennsylvania tax contacts and one with no Pennsylvania tax contacts—relevant to what is colloquially known as the Bank and Trust Company Shares Tax (Shares Tax),[1] which computes an institution's tax liability based on a moving six-year average value. First Union National Bank (Petitioner) argues that the Department of Revenue (Department) should not use a six-year average value to compute the Shares Tax for the value of shares attained through merger with non-Pennsylvania banks that had no pre-merger tax contacts with Pennsylvania. Petitioner appeals an order of the Board of Finance and Review, which upheld the Department's denial of its petition for tax refund.

The parties have stipulated to the following facts. There are three banks relevant to this appeal: "First Union National Bank" (North Bank), which possessed continuous tax contacts with Pennsylvania for the entire period relevant to this appeal; "CoreStates Bank, N.A." (CoreStates), which engaged in business in Pennsylvania for the entire period relevant to this appeal; and, "First Union National Bank (South)" (South Bank), which was only engaged in business in North Carolina.[2] These banks were all owned by a holding company, First Union Corporation (the "Holding Company"). South Bank, prior to 1998 and its merger with North Bank, was the surviving entity of multiple mergers of other small southern banks.[3] South Bank and the southern banks were all managed separately and independently from the North Bank and CoreStates. In 1998, CoreStates and South Bank both merged into the North Bank, with North Bank as the surviving entity. CoreStates and North Bank, before their mergers, separately and independently conducted business in and paid taxes to the Commonwealth of Pennsylvania. South Bank, however, was a North Carolina entity, which had no tax contacts with and paid no taxes to Pennsylvania. Consequently, South Bank was never independently subject to the Shares Tax.

Sections 701[4] and 701.1[5] of the Shares Tax govern the computation of the Shares

1. Act of March 4, 1971, *as amended*, 72 P.S. §§ 7701–7706.

2. Because the name "First Union National Bank (South)" is confusingly similar to "First Union National Bank," the parties agreed to refer to the former as the "South Bank" and the latter as the "North Bank" for purposes of this appeal.

3. These banks, all with no Pennsylvania tax contacts, included: Southern Bank and Trust Company (located in Greenville, South Carolina), Home Federal Savings Bank (located in Rome, Georgia), and Coral Gables Federal Savings and Loan Association (located in Coral Gables, Florida). (Stipulation of Facts ¶ C).

4. 72 P.S. 7701.

5. Section 701.1 of the Shares Tax, added by Section 2 of the Act of December 17, 1982, P.L. 1385, 72 P.S. § 7701.1, reads:

(a) The taxable amount of shares shall be ascertained and fixed by adding together the value determined under subsection (b) for the current and preceding five years and dividing the resulting sum by six. If an institution has not been in existence for a period of six years, the taxable amount of shares shall be ascertained and fixed by adding together the values determined under subsection (b) for the number of years the institution has been in existence and dividing the resulting sum by such number of years.

(b) The value for each year required by subsection (a) shall be determined by adding together the book value of capital stock paid in, the book value of the surplus and

Tax. Section 701 outlines what and when entities are required to pay the Shares Tax:

> Every *institution* shall make to the Department of Revenue a report in writing setting forth the full number of shares of the capital stock subscribed for or issued, as of the preceding January 1, by such *institution,* and the taxable amount of such shares of capital stock determined pursuant to section 701.1.

Section 701.5 of the Shares Tax[6] defines "institution" as: a "bank operating as such and having capital stock which is . . . **located within this Commonwealth.**" (Emphasis added.) The statutory mechanism for the actual computation is found in Section 701.1(a), which requires the adding together of the taxable amount of shares from that taxable year with the taxable amount of shares from the preceding five years and dividing that sum by six. Section 701.1(b) of the Shares Tax[7] bases the "average value" on the values reported by the institution on its quarterly Reports of Condition filed with federal bank regulators over the preceding six years. However, where there is a merger of two "institutions," under Section 701.1(c) of the Shares Tax[8] (the "combination provision"), the value of the combined "institutions" is the combined historical book values of the two separate institutions—the surviving and merged "institutions"—for the entire six-year period, divided by six. Pursuant to Section 701, the last step in the compu-

---

the book value of undivided profits with a deduction from the total thereof of an amount equal to the same percentage of such total as the book value of obligations of the United States bears to the book value of the total assets. For purposes of this subsection, book values and deductions for United States obligations for each year shall be determined by the Reports of Condition for each calendar quarter of the preceding calendar year in accordance with the requirements of the Board of Governors of the Federal Reserve System, the Comptroller of the Currency, the Federal Deposit Insurance Corporation or other applicable regulatory authority; and book values shall be averaged as calculated by averaging book values as determined by such Reports of Condition. For purposes of this article, United States obligations shall be obligations coming within the scope of 31 U.S.C. § 3124. For any year in which an institution does not file four quarterly Reports of Condition, book values and deductions for United States obligations shall be determined by adding together the book values and deductions for United States obligations from each quarterly Reports of Condition filed for such year and dividing the resulting sums by the number of such Reports of Condition. In the case of institutions which do not file such Reports of Condition, book values shall be determined by generally accepted accounting principles as of the end of each calendar quarter. For any year in which an institution which does not file Reports of Condition is not in existence for four quarters, the book value for that year shall be determined by adding together the book values for each quarter in which the institution was in existence and dividing by that number of quarters. For purposes of this section, a partial year shall be treated as a full year.

6. This provision was added by Section 17 of the Act of June 16, 1994, P.L. 279, 72 P.S. § 7701.5.

7. 72 P.S. § 7701.1(b)

8. The "combination provision," in totality, provides:

> [T]he combination of two or more institutions into one shall be treated as if the constituent institutions had been a single institution in existence prior to as well as after the combination and the book values and deductions for United States obligations from the Reports of Condition of the constituent institutions shall be combined. For purposes of the preceding sentence, a combination shall include any acquisition required to be accounted for by the surviving institution under the pooling of interest method in accordance with generally accepted accounting principles or a statutory merger or consolidation.

**714** ■

tation of the Shares Tax requires the multiplication of an institution's total Shares Tax liability at 1.25 percent of its six-year average. 72 P.S. § 7701.

At issue in this case is the Shares Tax paid by North Bank in 1999, which was based on its average value for the years 1993 through 1998. Throughout this six—year period, North Bank was required to pay Shares Tax because it was engaged in business in Pennsylvania and, thus, was an "institution" as defined by Section 701.5 of the Shares Tax.[9] In computing that average, North Bank combined its own six-year average value, with the six-year average value of CoreStates, and the *post—merger* value of South Bank. North Bank computed its Shares Tax liability and made its payment to the State Treasurer. Thereafter, the Department audited North Bank's tax report and recomputed North Bank's Shares Tax liability based on an inclusion of the *pre—merger, six-year average* value of South Bank. That recomputation resulted in an increase in North Bank's Shares Tax from $12,533,261 to $23,461,115.

■ North Bank paid that assessment[10] "under protest" and timely filed a petition for refund with the Department's Board of Appeals, which, subsequently, denied that petition. North Bank then appealed to the Board of Finance and Revenue repeating its argument that, under the provisions of the Shares Tax and the United States Constitution, the pre-merger book values of the South Bank and the small southern

banks were improperly included in North Bank's Shares Tax base. The Board of Finance and Revenue upheld the Board of Appeals' decision and North Bank, thereafter, filed the instant petition for review.[11]

North Bank's central argument is that South Bank was never an "institution" as defined by Section 701.5 of the Shares Tax, because it never engaged in business in Pennsylvania and, therefore, the "combination provision" does not apply to it. Consequently, it argues that the pre-merger, six-year average of South Bank's value was improperly included in the six-year measure of its Shares Tax. North Bank contends that the language of Section 701.1 of the Shares Tax, which specifically limits liability for the Shares Tax only to an "institution," is clear and unambiguous, so it must be followed.

North Bank asserts that the legislative history of the "combination provision" found in Section 701.1(c) of the Shares Tax buttresses its argument. Prior to 1994, the "combination provision" applied to the merger of all "banks." It was not until 1994 that the General Assembly amended the statute removing the term "banks" and replacing it with the term "institutions." North Bank posits that if the General Assembly intended the "combination provision" to continue to apply to all bank mergers, as the Commonwealth suggests, it would not have removed the term "banks" from the provision and replaced it with "institutions."

The Commonwealth counters that "[t]he [combination provision][12] merely gives a

---

72 P.S. § 7701.1(c)(2).

**9.** 72 P.S. § 7701.5.

**10.** North Bank paid the disputed tax in order to appeal the assessment.

**11.** Our scope of review is limited to questions "raised at any stage of the proceedings below" Pa. R.A.P. 1571(h). "When reviewing a decision of the Board of Finance and Reve-

nue, this Court has the broadest discretion because, although brought within our appellate jurisdiction, this Court essentially performs the function of a trial court." *See, e.g., Glenn Johnston, Inc. v. Commonwealth,* 712 A.2d 817, 819 n. 2 (Pa.Cmwlth.1998), *affirmed,* 556 Pa. 22, 726 A.2d 384 (1999).

**12.** The Commonwealth refers to the "combination provision" as the "merger provision."

rule to be applied in the case of a merger of two 'institutions.' It does not prohibit anything, including the application of the same rule to a merger involving a non 'institution' bank." (Commonwealth Br. at p. 7) (footnote omitted). The Commonwealth asserts that the "combination provision" found in Section 701.1 is entirely silent as to what calculation should be used in a case where an "institution" merges with a bank that is not an "institution." It explains that, in the face of this statutory silence, the Department exercised its authority as a tax administrator and applied the only calculation provided by the General Assembly with respect to bank mergers. The Commonwealth contends that the Department's inclusion of the six-year average of the pre-merger values of South Bank in the tax calculation was a reasonable interpretation of the statute, and that deference should be accorded to the judgment of the Department in the administration of the Shares Tax.[13]  Furthermore, the Commonwealth asserts that North Bank's position contains a basic inconsistency: it wishes to be treated as a single institution in existence prior to and after the merger, but wants to compute its taxable value solely with reference to its own and CoreStates pre-merger values and deductions, while excluding the values and deductions of South Bank. Therefore, it is the Commonwealth's position that a consistent interpretation of Section 701.1 should hold that if South Bank is not an "institution," then there is also no "combination of two or more institutions" into one institu-

tion; consequently, the merger provision of Section 701.1(c)(2) of the Shares Tax should not even apply to North Bank's Shares Tax computation.

■■■ This Court, in interpreting the law, cannot look beyond the language of an unambiguous statute. Section 1921(b) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(b); *Pennsylvania Financial Responsibility Assigned Claims Plan v. English*, 541 Pa. 424, 664 A.2d 84 (1995). In ascertaining the intention of the General Assembly in the enactment of a statute, we must presume that "the General Assembly intends the entire statute to be effective and certain." Section 1922 of the Statutory Construction Act of 1972, 1 Pa. C.S. § 1922(2). Moreover, statutory amendments indicate a change in legislative intent. *Masland v. Bachman*, 473 Pa. 280, 374 A.2d 517 (1977). When the General Assembly amends statutory language, the amendment must be construed as merging into the original statute and regarded as part of it; "the remainder of the original statute and the amendment shall be read together and viewed as one statute passed at one time." Section 1953 of the Statutory Construction Act of 1972, 1 Pa. C.S. § 1953. In addition, as the courts have consistently held in this Commonwealth, [a] taxing statute must be construed most strongly and strictly against the government, and if there is a reasonable doubt as to its construction or application to a particular case, the doubt must be resolved in favor of the taxpayer. *See, e.g., McNeil–PPC, Inc., v. Commonwealth,*

---

For clarity sake, we refer to Section 701.1(c) as the "combination provision."

**13.** The Commonwealth also makes two assertions in its brief that, admittedly, were *not considered by the Board of Finance and Revenue:* (1) "[C]an [North Bank] be valued as a new bank arising from the merger activities in 1998 for the purposes of the Shares Tax as of January 1, 1999?" and (2) "Is there any

constitutional impediment to the Bank Shares taxation of the admittedly unitary North Bank on an apportioned basis, where [North Bank] makes no challenge to the composition of the apportionment factor?" (Commonwealth Br. at 3.) Because these arguments were not brought before the administrative agency below, they are waived on appeal. Pa. R.A.P. 1571(h).

575 Pa. 50, 63, 834 A.2d 515, 523 (2003) (quoting *Commonwealth v. High Welding Co.*, 428 Pa. 545, 550, 239 A.2d 377, 379 (1968)).

■ Section 701.5 of the Shares Tax clearly defines "institution" so as not to include banks with no tax contacts with Pennsylvania. Because South Bank had no pre-merger tax contacts with Pennsylvania, it was not an "institution." Thus, its pre-merger value must be excluded when calculating the tax. In the 1994 amendments to Section 701.1 of the Shares Tax,[14] the General Assembly changed all references in the Shares Tax statute from "banks" to "institutions." The Department's interpretation of the Shares Tax does not distinguish between institutions and banks. Were we to follow that interpretation, and read "institutions" to mean "banks," we would not be giving effect to the statutory amendments. This we cannot do. It is true that the General Assembly did not enact a provision specifying the formula for calculating the Shares Tax where an institution merges with a bank that does not meet the definition of an institution. However, even if we were to determine that the statute was not clear because it does not contain this specific formula, we would have to resolve any ambiguity in favor of the taxpayer.[15] *McNeil–PPC.*

Therefore, because South bank had no tax contacts with Pennsylvania before the merger and, so, was not an "institution" and, thus, not subject to the Shares Tax, its pre-merger, six-year average value cannot be included in North Bank's 1999 six-year average value to compute North Bank's 1999 Shares Tax liability.[16]

Accordingly, the order of the Board is reversed and the Department is hereby ordered to reduce North Bank's 1999 Shares Tax to an amount consistent with this opinion and to refund the tax paid in excess of that amount.

Judge SMITH–RIBNER dissents.

14. The language of Section 701.1(c) of the Shares Tax was amended by Act No. 48 of 1994, P.L. 279, in the following manner:
   (c) For purposes of this section:
   (1) a mere change in identity, form or place of organization of one ~~bank~~ [institution], however effected, shall be treated as if a single ~~bank~~ [institution] had been in existence prior to as well as after such change; and
   (2) the combination of two or more ~~banks~~ [institutions] into one shall be treated as if the constituent ~~banks~~ [institutions] had been a single ~~bank~~ [institution] in existence prior to as well as after the combination and the book values and deductions for United States obligations from the Reports of Condition of the constituent ~~banks~~ [institutions] shall be combined. For purposes of the preceding sentence, a combination shall include any acquisition required to be accounted for by the surviving ~~bank~~ [institution] under the pooling of interest method in accordance with generally accepted accounting principles or a statutory merger or consolidation.

15. North Bank also argues that if the pre-merger book values of South Bank and the small southern banks are included in North Bank's Shares Tax base, as the Commonwealth contends they should be, the resulting tax would violate the United States Constitution on both due process and commerce clause grounds. Because of our holding, we do not reach these arguments.

16. The Commonwealth argues, in the alternative, that North Bank should be treated as a new bank. We agree with North Bank that there is no statutory support whatsoever for this proposed taxing scheme. Finally, the Commonwealth also argues, in the alternative, that North Bank is a "unitary business" subject to the tax on an apportioned basis. We disagree. As North Bank correctly recognizes in its brief, the Commonwealth, in advancing this theory, improperly focuses on the *post*-merger time frame, not the six years preceding the merger, during which time North Bank and South Bank *admittedly were not unitary.* (North Bank Reply Br. at 6–7.)

## ORDER

NOW, February 2, 2005, the order of the Board of Finance and Revenue in the above-captioned matter is REVERSED. The Department of Revenue is hereby ordered to reduce North Bank's 1999 Shares Tax in an amount consistent with this opinion and to refund the tax paid in excess of that amount. Jurisdiction is relinquished. The Chief Clerk is directed to enter this order as final unless exceptions are filed within 30 days in conformity with Pa. R.A.P. 1571(i).